IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDNA HESS, | ) | 1:10-cv-01821-AWI-BAM |
| | ) | |
| Plaintiff, | ) | **ORDER RE: MOTION FOR** |
| | ) | **SUMMARY JUDGMENT OR** |
| v. | ) | **SUMMARY ADJUDICATION** |
| | ) | |
| MADERA HONDA SUZUKI; HARRY D. | ) | (Docs. 24-24-10, 30) |
| WILSON, INC.; ROBERT D. WILSON; | ) | |
| and DOES 1 through 10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I. INTRODUCTION

Defendants Madera Honda Suzuki et al. have filed a motion for summary judgment or summary adjudication in the alternative.  For reasons discussed below, the motion shall be denied.

## II. FACTS AND PROCEDURAL BACKGROUND

On October 1, 2010, plaintiff Edna Hess (hereinafter referred to as "Plaintiff") filed her complaint against defendants Madera Honda Suzuki, a California corporation, Harry D. Wilson, Inc., a California corporation, Robert D. Wilson, an individual, and Does 1 through 10, inclusive, asserting causes of action for (1) violation of California Labor Code § 201, (2) violation of the federal Fair

Labor Standards Act, 29 U.S.C. § 206, (3) violation of California Labor Code § 226, (4) violation of California Labor Code § 1174, (5) violation of California Labor Code § 227.3, (6) violation of California Labor Code § 1197, (7) violation of California Labor Code §§ 226.7 and 512 and Industrial Welfare Commission (IWC) Wage Order 4-2001, (8) violation of California Labor Code § 510 and IWC 4-2001, (9) violation of California Business and Professions Code §§ 17200 et seq., (10) wrongful termination in violation of public policy, (11) penalties under California Labor Code § 203 and (12) penalties under 29 U.S.C. § 216.  The first and third through eleventh causes of action were asserted against the corporate defendants and Does 1-10, inclusive; the second and twelfth causes of action were asserted against all defendants.  In the complaint, Plaintiff alleged as follows:

> "Plaintiff was hired as a [sic] office manager by Defendants MADERA HONDA SUZUKI and HARRY D. WILSON, INC. on or about September 1, 2006. Defendant ROBERT D. WILSON made the decision to hire Plaintiff.  As an office manager, Plaintiff performed a variety of routine and clerical tasks including making deposits, creating payroll sheets, answering phones, cashiering, cleaning restrooms, making employee schedules, distributing the mail and entering inventory."

Plaintiff further alleged:

> "Initially, Plaintiff was mischaracterized as an exempt employee and paid a salary of $2,000 bi-monthly.  Plaintiff was actually a non-exempt employee, performing only routine and clerical duties.  Beginning the pay period of April 26, 2007 – May 9, 2007 and continuing thereafter up until the time of Plaintiff's discharge, Defendant ROBERT D. WILSON authorized, and Plaintiff received, a raise and her salary was increased to $2,769.23 bi-monthly."

Plaintiff further alleged:

> "Plaintiff was provided regular pay checks every two weeks from the date of her hire in September 2006 until January 2008.  Beginning January 2008 and continuing intermittently up to Plaintiff's termination in February of 2010, Defendants, and each of them, failed and refused to pay Plaintiff wages due and owing to her.  Defendants willfully failed to pay Plaintiff a total of 40 weeks worth of wages between January 18, 2008 and January 29, 2010."

Plaintiff further alleged:

> "Plaintiff confronted . . . ROBERT D. WILSON about the Defendants' failure to pay Plaintiff her wages and demanded payment of wages earned.  Defendant ROBERT D. WILSON was involved in, and had control over, the amount of compensation Plaintiff received.  When confronted by Plaintiff, ROBERT D. WILSON responded that the company was having financial difficulties and assured Plaintiff that she would be compensated when the company's financial condition improved."

Plaintiff further alleged:

> "On or about January 29, 2010, Defendants[ ], by and through ROBERT D. WILSON, terminated Plaintiff's employment without good cause. [¶] On or about February 24, 2010, Plaintiff made a written demand to Defendants requesting payment of all wages due and owing for those 40 pay periods Defendants unlawfully withheld Plaintiff's wages. To date, Defendants have willfully refused to pay Plaintiff those wages due and owing to her."

Plaintiff further alleged:

> "On or about March 30, 2010, Plaintiff made a demand . . . requesting accurate itemized statements in writing showing: (1) her gross wages earned; (2) total hours worked by Plaintiff; (3) all deductions provided; (4) net wages earned; (5) inclusive dates of the period for which Plaintiff was paid; (6) the names and address of the legal entity that is the employer; and (7) all applicable hourly rates in effect during each pay period and the corresponding number of hours worked at each hourly rate by Plaintiff. Plaintiff further requested any and all documents and instruments signed by her, relating to her employment under Labor Code Section 432. To date, Defendants have failed to comply with Plaintiff's requests."

On July 13, 2012, defendants Harry D. Wilson, Inc. dba Madera Honda Suzuki (erroneously sued as Madera Honda Suzuki and Harry D. Wilson, Inc.) and Robert D. Wilson (hereinafter referred to as "Defendants") filed their motion for summary judgment or summary adjudication in the alternative pursuant to Federal Rule of Civil Procedure 56. Plaintiff filed her opposition to Defendants' motion for summary judgment or summary adjudication on August 6, 2012. Defendants filed their reply to Plaintiff's opposition to the motion for summary judgment on August 13, 2012.

## III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

3

1   *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ.

2   P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial, the moving party

3   need only prove that there is an absence of evidence to support the non-moving party's case."  *In re*

4   *Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325).  If

5   the moving party meets its initial burden, the burden shifts to the non-moving party to present

6   evidence establishing the existence of a genuine dispute as to any material fact.  *See Matsushita Elec.*

7   *Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538.  A

8   court ruling on a motion for summary judgment must construe all facts and inferences in the light

9   most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255,

10  106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Even if the motion is unopposed, the movant is not

11  absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries,*

12  *Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions

13  of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and

14  other supporting materials show the movant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2), (3).

15

16                                        **IV. DISCUSSION**

17

18  *1. Defendants' first argument (no liability under the Fair Labor Standards Act)* – As a threshold

19  matter, Defendants move for summary adjudication of the second and twelfth causes of action for

20  violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq., and penalties under

21  section 216 of the FLSA, 29 U.S.C. § 216.  "The FLSA imposes minimum labor standards on

22  employers to promote 'the health, efficiency, and general well-being of workers.' " *Christopher v.*

23  *SmithKline Beecham Corp.,* 635 F.3d 383, 389 (9th Cir. 2011) (quoting 29 U.S.C. § 202(a)).  Section

24  206, the minimum wage provision invoked by Plaintiff, provides in pertinent part: "Every *employer*

25  shall pay to each of his *employees* who in any workweek is engaged in commerce or in the

26  production of goods for commerce, or is employed in an enterprise engaged in commerce or in the

27

28                                               4

production of goods for commerce, wages at the following rates: [¶] (1) except as otherwise provided in this section, not less than-- [¶] (A) $5.85 an hour, beginning on the 60th day after May 25, 2007; [¶] (B) $6.55 an hour, beginning 12 months after that 60th day; and [¶] (C) $7.25 an hour, beginning 24 months after that 60th day[.]" 29 U.S.C. § 206(a) (emphasis added).  Plaintiff alleges Defendants violated this provision by failing to pay her for 40 weeks' worth of wages.  Defendants now contend summary adjudication must be granted because Plaintiff is a co-owner/shareholder of Harry D. Wilson, Inc., and is therefore not an "employee" of Defendants as that term is defined in the FLSA.

With certain exceptions not applicable here, the FLSA defines "employee" simply to mean "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an " '[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" *Id.,* § 203(d).  The Ninth Circuit, "in deciding if an employer-employee relationship exists, has applied an 'economic reality' test which identifies four factors: [¶] whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1324 (9th Cir. 1991) (citing *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir. 1983) (abrogated on other ground by *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 539, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985))).  However, "these particular factors are merely guidelines . . . . 'The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." ' " *Gilbreath, supra,* at p. 1324 (quoting *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)).  "Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the [FLSA], and is subject to liability."  *Boucher v. Shaw,* 572 F.3d 1087, 1091 (9th Cir. 2009)  (quoting *Lambert v. Ackerley,* 180 F.3d 997, 1012 (9th Cir. 1999)).  "The touchstone is the 'economic reality' of the relationship," *Boucher, supra,* at p. 1091 (quoting

5

*Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)):

"Economic realities, not contractual labels, determine employment status for the remedial purposes

of the FLSA." *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 755 (9th Cir. 1979).

Having reviewed the pleadings and all competent and admissible evidence submitted, the Court finds

genuine issues of material fact as to whether, under the totality of the circumstances, the economic

reality of the relationship between Defendants and Plaintiff reflected one of employer/employee.

As support for the contention Plaintiff was not their employee, Defendants point to evidence

in the record, primarily from Plaintiff's deposition testimony, establishing the following.  After

investing $100,000 ($50,000 allocated to stock and $50,000 as a business loan) with her husband,

Terry Hess, Plaintiff became a co-owner of Madera Honda Suzuki, controlling 24 percent of the

100,000 shares of common stock originally issued by Harry D. Wilson, Inc.  (Terry controlled 25

percent; defendant Robert Wilson controlled 26 percent while his wife, Lisa, controlled 25 percent.)

Plaintiff was then elected as a director and chief financial officer of the corporation.  Pursuant to

their investment, it appears Plaintiff and her husband provided personal guarantees to Central Valley

Bank for money presumably borrowed by the company.  Plaintiff further stated she and her husband

provided personal guarantees to American Honda and Suzuki, presumably to cover debts and

obligations that might be incurred by the company through its sale of Honda and Suzuki motorcycles.

Plaintiff understood it was possible she might lose some or all of her investment, and that even if the

business were successful, it would take some time before it would start showing a profit.  Plaintiff

further understood that although the shares of stock were split 51 percent/49 percent between the

Wilsons and the Hesses, everything else – including profits – would be divided equally (i.e., 50/50

between the Wilsons and the Hesses).  According to Plaintiff, the business never made a profit.

Plaintiff testified it was her responsibility to pay bills and that she had authority to pay certain

expenses, such as rent and dealership insurance, without consulting the other officers.  Plaintiff was

authorized to issue payroll checks to herself and others if the company had sufficient funds, and it

appears Plaintiff issued a check to herself at least once during her tenure as CFO.  At his deposition,

Wilson testified he and Plaintiff interviewed prospective employees together and that Plaintiff "had a say in everybody [the company] hired." Wilson further testified Plaintiff handled employee disciplinary matters "95 percent of the time" and that she was not required to consult with him before terminating an employee. It also appears Plaintiff was afforded special benefits. Plaintiff testified "if [she or Wilson] took days off, since [they] were on salary, [they] would be paid the days." Other employees also had paid vacation, but only for a limited number of days. The company paid for vehicles and fuel for the Wilsons and the Hesses, whereas other employees did not have a vehicle allowance. Per Wilson, the company paid the cost of health insurance for shareholders, including Plaintiff, whereas it covered only part of the premiums for employees, who had to contribute the rest. All of this evidence, Defendants contend, shows Plaintiff was a co-owner, not an employee.

Defendants' argument, in essence, is that Plaintiff cannot be considered an employee because Plaintiff assumed significant business risk, had involvement and discretion in the corporate decision-making process and was entitled to benefits not available to Madera Honda Suzuki's other employees, none of which was consistent with employee status. If Plaintiff were nothing more than a director, officer and shareholder of the company, the Court might be inclined to agree. The evidence in the record clearly shows Plaintiff had a substantial ownership interest in the company and partial control of the company's finances. Plaintiff also had substantial involvement in managing and paying workers. These functions, standing alone, are not characteristic of an employee. In the Court's view, however, these functions – when considered in the context of the four-factor economic realities test – indicate simply that Plaintiff, like Wilson, was *an employer vis-a-vis the other employees* hired by the company. But they do not conclusively resolve the issue of *whether Plaintiff herself could or could not have been one of the company's employees*. That is to say, the possibility Plaintiff was someone else's employer does not foreclose the possibility she was Defendants' employee. The evidence shows Plaintiff was not merely a director, officer and shareholder, but was also hired to work as the company's office manager. The evidence further shows Plaintiff was initially paid hourly wages for working as the office manager, at a rate

7

determined by Wilson.  Defendants have provided no authority – and the Court's research reveals no authority – stating categorically that a co-owner and shareholder of a closely held corporation who works for the corporation in another capacity, as was apparently the case here, cannot also be the corporation's employee for the purpose of the FLSA.  Indeed, case law seems to suggest otherwise.  *See Goldberg v. Whitaker House Co-op, Inc.,* 366 U.S. 28, 32, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) ("There is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship.  If members of a trade union bought stock in their corporate employer, they would not cease to be employees within the conception of [the FLSA].  For the corporation would 'suffer or permit' them to work whether or not they owned one share of stock or none or many").

The plaintiffs in *Gionfriddo v. Jason Zink, LLC,* 769 F.Supp.2d 880 (D. Md. 2011), were formerly employed as bartenders and sous chefs at the Don't Know Tavern and the No Idea Tavern in Baltimore's Federal Hill neighborhood.  *Id*. at 885.  In 2009, they sued the proprietor of the two taverns, Jason Zink, and his various corporate entities alleging unlawful wage and hour practices under the FLSA.  Zink owned and operated both establishments, but he also worked as a bartender, serving drinks and conversing with patrons.  In conjunction with this activity he received tips he contributed to a collective tip pool, which was divided up among the bartenders according to a formula that took into account the number of hours each bartender worked.  Although Zink received partnership distributions from the taverns, he did not draw a salary; his primary mode of compensation appeared to be the tips.  *Id.* at 884.  The plaintiffs alleged Zink was precluded from participating in the tip pool because of his status as the plaintiffs' employer, contending it was contrary to the mandates of the FLSA for an employer to receive tips while simultaneously benefitting from the "tip credit" exception to the FLSA's minimum wage requirements.[1]  *Id.* at 893.

---

[1] "The FLSA's definition of 'wage' recognizes that under certain circumstances, employers of 'tipped employees' may include part of such employees' tips as wage payments."  *Cumbie v. Woody Woo, Inc.,* 596 F.3d 577, 580 (9th Cir. 2010) (citing 29 U.S.C. § 203(m)).  This is known as the "tip credit," and permits employers to pay their employees "less than the minimum wage so long as the tips the employees receive make up the difference between the tipped wage rate and the full

On motion for summary judgment, Zink conceded he was an employer under section 203(d), but argued he was nonetheless permitted to share in the tip pool by virtue of his participation in an activity (bartending) that customarily receives tips.  The court rejected this contention.  *Id.* at 893.

Citing, *inter alia*, *Chung v. New Silver Palace Restaurant, Inc.,* 246 F.Supp.2d 220 (S.D.N.Y. 2002), which observed "Congress, in crafting the tip credit exception of section 3(m) of the FLSA[,] did not create a middle ground allowing an employer both to take the tip credit and share employees' tips," *id*. at 230, the court reasoned: "Mr. Zink is the sole owner of both Taverns, and is unquestionably an 'employer' under the FLSA . . . . [I]t would be anathema to the purpose behind the FLSA to simultaneously allow him to take tips from a collective tip pool that was set up to allow him to pay his employees at a rate substantially below the minimum wage.  As the sole owner of the Taverns, Mr. Zink is essentially the sole beneficiary of the 'tip credit' provision of the FLSA.  As such he is prohibited from participating in the tip pool at the Taverns.  A contrary finding, allowing an owner to participate in a tip pool, would broaden the FLSA's tip credit provisions to a point where they would become meaningless."  *Gionfriddo, supra,* 769 F.Supp.2d at 894.  In reaching this conclusion, the court acknowledged, however, that in closer cases it might be theoretically possible for an individual to be both an owner/employer *and* an employee entitled to share in a tip pool.  *Id*.

The Court agrees with *Gionfriddo*, and in the Court's view, the possibility an individual could simultaneously be both an owner/employer and an employee exists outside the tip context.  Support for this proposition, one court has observed, may be found in the FLSA itself.  As noted, "employee" refers to "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  " 'Employ' includes to suffer or permit to work."  29 U.S.C. § 203(g).  "[I]t appears from this language that if an owner or manager performs work," as here, "that person fits within the definition of employee."  *Aguirre v. Safe Hurricane Shutters, Inc.,* slip copy, 2011 WL 5986817 (S.D. Fla. 2011), at *1.  The

minimum wage."  *Gionfriddo, supra,* 769 F.Supp.2d at 885 n. 2 (citing 29 U.S.C. § 203(m)).  "[A]n employer may not avail itself of the tip credit if it requires tipped employees to share their tips with employees who do not 'customarily and regularly receive tips.' "  *Shahriar v. Smith & Wollensky Restaurant Group,* 659 F.3d 234, 240 (2d Cir. 2011) (citing 29 U.S.C. § 203(m)).

9

*Aguirre* court noted its interpretation was reinforced by section 203(s), which defines what enterprises are engaged in commerce or in the production of goods for commerce.[2]   Section 203(s) provides in pertinent part: "Any establishment that has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce or a part of such an enterprise."   29 U.S.C § 203(s)(2).   "This statutory provision expressly describes [a] situation where an owner is an 'employee,' and would make no sense if the owner of [an] establishment could never be considered to be an employee.   If an owner can be an employee, then logically, a manager can also be considered an employee[.]" *Aguirre, supra,* at *1.

To support the proposition Plaintiff was not an employee under the FLSA, Defendants cite *Steelman v. Hirsch,* 473 F.3d 124 (4th Cir. 2007), and *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir. 1987).   The parties in *Steelman*, plaintiff Tammy Steelman and defendant Michelle Hirsch, were domestic partners who worked together at Hair of the Dog, a dog-grooming business founded by Hirsch as a sole proprietorship.   *Steelman, supra,* at p. 125.   Steelman performed tasks such as bathing and grooming dogs and ordering, receiving and selling merchandise.   When the company hired additional workers, she acted as their supervisor and had the authority to hire and fire.   The couple did not have a compensation agreement.   However, they agreed to pay their living expenses from Hair of the Dog's revenue, which they did throughout their relationship, and they took the company's successes and failures into consideration when making spending decisions.   Both parties covered their personal expenses using separate American Express cards whose bills were paid from the business proceeds, and they had a joint checking account to which Steelman would generally have to ask Hirsch to transfer money before making large expenditures.   Steelman also claimed Hirsch had told her that " '[w]hat was [Steelman's] was [Hirsch's] and what was [Hirsch's] was

---

[2] Congress enacted the FLSA to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" in "industries engaged in *commerce* or in the production of goods for *commerce*." 29 U.S.C. § 203(a) (emphases added).

[Steelman's],' " and further promised Steelman would have a 26 percent stake in the business and possibly other forms of compensation. *Id*. at 126. After their romantic and professional relationship collapsed, Steelman brought an action against Hirsch seeking an ownership interest in Hair of the Dog and compensation for work she alleged was performed in reliance on Hirsch's promises, in addition to or in lieu of damages under the FLSA and the North Carolina Wage and Hour Act. *Id.* at 125. The district court granted summary judgment in favor of Hirsch on the FLSA claim, finding the evidence showed Steelman was a partner of Hirsch's, not an employee. In particular, the court held Steelman's own testimony she was a partner undercut the FLSA claim because a partnership was not consistent with an employer-employee relationship. *Id.* at 127. The Fourth Circuit affirmed.

On appeal, Steelman reiterated her claim to a partnership stake in Hair of the Dog and conceded such a claim would preclude her from being an "employee" under the FLSA. *Steelman, supra,* 473 F.3d at 128. However, Steelman argued that because she had asserted wage claims in the alternative, if her ownership claim failed, she should, by default, be adjudged an employee entitled to recover back wages. The court rejected this contention: "We agree that a party may make claims of ownership and employee status in the alternative. But federal law does not divide the world exclusively into owners and employees." *Id*. The court concluded Steelman could not have been an employee regardless of her ownership status: "According to [Steelman], the couple saw their work together as a way to improve an economic future that they intended to share in perpetuity, rather than as a transfer of one individual's assets to another in exchange for labor. [Steelman] did not obtain a bargained-for portion of her supposed employer's assets – she took from those assets for her own purposes with a discretion that is fundamentally alien to employer-employee relationships. [¶] . . . She funded her day-to-day expenditures using an American Express card whose bills were paid by the business and by withdrawals from a joint checking account containing funds transferred from Hair of the Dog . . . . [¶] Such extensive access to company funds is not the kind of privilege that employees enjoy with respect to their employers' revenue." *Id*. at 130. The court further reasoned the entrepreneurial nature of the parties' relationship did not support finding Steelman was an

employee: "[Steelman] and [Hirsch] shared the risks and rewards of their joint venture in a fashion more characteristic of a partnership . . . . They adjusted their expenditures to the company's successes and setbacks. Each would on occasion call [Hirsch's] mother, who handled the company's accounting, to ask whether the couple could afford a desired purchase, given the company's performance . . . . We do not hold that compensation linked to company performance is inherently incompatible with an employee relationship, but . . . real opportunity to share in the profits of the business is a consideration that weighs against such status." *Id.* (internal citations, quotations omitted). Evidence Steelman performed the same duties as Hirsch and had supervisory authority, including hiring and firing, over employees was consistent with this conclusion. *Id*. at 130-31.

*Steelman* relied in part on *Wheeler*, which addressed the question of whether a bona fide partner in a general partnership accounting firm could also be an employee of the firm under the FLSA. *Wheeler, supra*, 825 F.2d at 258. The Tenth Circuit concluded the answer was no: "Status as a general partner carries important economic reality . . . . Employees do not assume the risks of loss and liabilities of their employers; partners do. It is no small thing to be exposed to unlimited liability, to be personally at risk for a partner's mistakes, and to have one's share of profits always potentially conditional upon the outcome of claims, suits, and obligations generated by another partner . . . . Even if the partnership is viewed as an entity separate from the partners for some purposes, it cannot shield the partners from risk, including liabilities arising from suits by other partners. There is simply no equivalent to unlimited liability in *any* case dealing with the definition of employee, nor is there any equivalent in any understood definition of the term." *Id*. at 275 (emphasis original). The court further concluded: "Other common characteristics of partnerships are profit sharing; contributions to capital; part ownership of partnership assets, including a share of assets in dissolution of the enterprise; and the right to share in management subject to agreement among the partners. These are economic realities, and no definition of 'employee' is co-extensive. Additionally . . . , an entirely different body of statutes and case law applies to partners and partnerships, conferring rights and imposing obligations wholly foreign to, for instance a corporate

12

employee.  When individuals combine to carry on business as partners all these factors introduce

complexities and economic realities which are not consonant with employee status." *Id*. at 274-75.

      Neither *Steelman* nor *Wheeler* is of any assistance to Defendants.  The businesses in both

*Steelman* and *Wheeler* were partnerships.  By contrast, Harry D. Wilson, Inc., is a closely held

corporation registered as an S corporation with the IRS.[3]  While the business relationship between

Plaintiff and Wilson may have been similar to the partnership in *Steelman*, it lacked the

characteristics the *Steelman* court found to be the most critical indicia of a partnership and why a

partnership was not consistent with an employer-employee relationship.  The court emphasized

Steelman was able to fund her personal expenditures using the company's assets, and she took those

assets from a joint checking account she shared with Hirsch.  *Steelman, supra,* 473 F.3d at 131.

Nothing suggests Plaintiff did – or could have done – the same with Wilson's assets here.  This

illustrates a fundamental difference between partnerships and corporations: Partners have ownership

interests in the assets of the partnership, whereas "[a]n individual shareholder, by virtue of his

ownership of shares, does not own the corporation's assets[.]"  *Dole Food Co. v. Patrickson,* 538

U.S. 468, 474-75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).  The court further found Steelman had

an opportunity to share in the profits of Hair of the Dog with Hirsch.  *Steelman, supra,* at p. 130. The

reason why partners receive profits is not analogous to the reason why corporate owners receive

profits: Even though, like Steelman and Hirsch, Plaintiff would have shared profits with Wilson,

unlike Steelman and Hirsch, who were entitled to profits from Hair of the Dog by virtue of the work

they performed at the salon, Plaintiff's profit sharing would only have been by virtue of her status

as a shareholder; it would not have been by virtue of any work she might have performed for the

company as director, officer or office manager.  *See Durando v. U.S.,* 70 F.3d 548, 552 (9th Cir.

1995) ("[I]t [is] improper to treat income earned by a corporation through its trade or business as

---

    [3] Although neither party filed a copy of the Form 2553 (Election by a Small Business Corporation) presumably submitted to the IRS, both parties have represented to the Court that Harry D. Wilson, Inc. dba Madera Honda Suzuki is in fact an S corporation.

though it were earned directly by its shareholders, even when . . . the shareholders' services help to produce that income.  An S corporation's income passes through to its shareholders not because they helped to create that income, but because they are shareholders" (citing I.R.C. § 1366(a)). Defendants correctly observe Plaintiff assumed more risk of liability than the typical shareholder by providing personal guarantees to corporate creditors.  Problematically for Defendants, inasmuch as the evidence has been presented to the Court, Plaintiff provided nothing more than a guarantee for one bank loan in an unspecified amount and a guarantee of an unspecified nature to two motorcycle manufacturers.  Absent argument or evidence to explain the extent of these guarantees, the Court cannot find they transformed Plaintiff's limited liability as a shareholder into potentially unlimited liability or even liability on the level of a non-limited liability partner, as Defendants imply.

Second, and perhaps more importantly, Steelman and Hirsch "saw their work together as a way to improve an economic future that they intended to share in perpetuity, rather than as a transfer of one individual's assets to another in exchange for labor," *Steelman, supra,* 473 F.3d at 130, as is generally the case with partners.  But again, Harry D. Wilson, Inc., is a closely held S corporation, not a partnership.  The fact the company is a closely held corporation is key because shareholders view closely held corporations precisely as a means of acquiring corporate assets through *employment*: "Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a close corporation considers himself or herself as a co-owner of the business and wants the privileges and powers that go with ownership.  Employment by the corporation is often the shareholder's principal or sole source of income.  Providing employment may have been the principal reason why the shareholder participated in organizing the corporation.  Even if shareholders in a close corporation anticipate an ultimate profit from the sale of shares, they usually expect (or perhaps should expect) to receive an immediate return in the form of salaries as officers or employees of the corporation, rather than in the form of dividends on their stock.  Earnings of a close corporation are distributed in major part in salaries, bonuses and retirement benefits[.]" *Hollis v.*

*Hill,* 232 F.3d 460, 467 (5th Cir. 2000) (citing F. Hodge O'Neal & Robert B. Thompson, 1 O'Neals Close Corporations § 1:08, at 31-32 (3d ed. 1998)).  In addition, California courts have rejected the premise, accepted in other jurisdictions – *see, e.g., Walta v. Gallegos Law Firm, P.C.,* 131 N.M. 544, 553, 40 P.3d 449 (2001); *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 592-93, 328 N.E.2d 505 (1975) – that, due to similarities between closely held corporations and partnerships, shareholders in a closely held corporation owe each other essentially the same fiduciary duties in the operation of the business as do partners.  *Costanza v. Simon Equipment Co., Inc.,* 2006 WL 2349594 (Cal.App. 2 Dist. 2006) (unpublished), at *13 (and authorities cited).[4]  Instead, "California cases have held shareholders to the same fiduciary duty standards that generally apply in non closely held corporations."  *Id*. (and authorities cited); *see Neubauer v. Goldfarb,* 108 Cal.App.4th 47, 133 Cal.Rptr.2d 218 (2003).  These observations support the conclusion a closely held corporation should not be treated like a partnership for the purposes of an FLSA analysis.

In their reply, Defendants contend that because the evidence shows the business relationship between Plaintiff and Defendants was similar to a partnership, *Steelman* and *Wheeler* should still control, even though Harry D. Wilson, Inc., is not a partnership but a corporation.  This argument is not necessarily without merit.  One court has explained: "For federal income tax purposes, there are two kinds of corporations: 'C corporations' (so named because their governing provisions are found in Subchapter C, Chapter 1, Subtitle A of the Internal Revenue Code) and 'S corporations' (governed by Subchapter S of the same chapter).  A C corporation is a separate entity which pays corporate income taxes 'according to or measured by its net income.' [Citation.] [¶] . . . [A]n S corporation generally does not pay income taxes as an entity. [Citation.] Rather, the S corporation files only an informational return reporting for the taxable year its gross income (or loss) and deductions, its shareholders, and the shareholders' pro rata shares of each item. [Citation.] The items are then 'passed through' on a pro rata basis to the shareholders, who report them on their personal

---

[4] The Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

income tax returns. [Citations.] '*The S corporation is, in effect, a Code-created hybrid combining traits of both corporations and partnerships.*' [Citation.]" *Heller v. Franchise Tax Bd.,* 21 Cal.App.4th 1730, 1733, 27 Cal.Rptr.2d 88 (1994) (emphasis added).   Problematically for Defendants, Madera Honda Suzuki remains a corporation regardless of its similarity to a partnership. The Court has already explained why the reasoning of *Steelman* and *Wheeler* is not applicable to the corporate form.   (In *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 985 (10th Cir. 2002), the Tenth Circuit made clear its holding in *Wheeler* applied only to partnerships, not corporations.)

　　　In the Court's view, the circumstances here are more apposite to those in *Hoy v. Progress Pattern Co.,* 217 F.2d 701 (6th Cir. 1954).   The plaintiff in *Hoy* alleged he was employed by the defendant corporation for work weeks in excess of 40 hours between August 24, 1951 and August 10, 1953 and that the defendant failed to compensate him for those excess hours in violation of the FLSA's overtime provisions.   *Id*. at 702.   The defendant moved to dismiss the complaint, contending that because the plaintiff was one of five stockholders in the corporation owning 225 of the 1725 shares issued, occupied an administrative position and served as a director, chairman of the board of directors and vice president, he was not an employee within the meaning of the FLSA.   *Id*.  at 702-703.   The defendant also submitted a declaration to this effect.   *Id.* at 703.   In opposition the plaintiff submitted his own declaration, testifying among other things that he was an officer in name only and that he worked at a bench, receiving no compensation except the wages he earned as a pattern maker. The plaintiff further testified the president, secretary and a third employee did "all of the supervising and the laying out of the work on the jobs."   *Id*. at 703.   The district court granted the motion, concluding the plaintiff and his co-workers "were more akin to self-employed workers than they were to employees working for an employer, similar to partners in a partnership agreeing among themselves to perform all the working operations of the business," and were therefore not employees. *Id*.   The Sixth Circuit reversed, finding the plaintiff's opposing declaration presented a factual question as to whether he was an employee under the FLSA.   *Id*. at 704. The court concluded a "stockholder-officer-director relationship with the corporation . . . by itself does not prevent a

stockholder, officer, or director from also being an employee covered by the [FLSA] . . . . [I]t is necessary to know and consider all the facts bearing upon [plaintiff's] authority and duties, and the actual relationship existing between [him] and the dominant stockholders and officers of the [defendant] corporation, regardless of the titles which were conferred by the corporation . . . ." *Id*.

Here, Plaintiff has not only alleged facts sufficient to show she was an employee under the FLSA, but has adduced evidence in opposition to the motion for summary judgment from which a reasonable trier of fact could make such a finding. The evidence suggests at the time Plaintiff began working as the office manager, it was Wilson who determined Plaintiff would be compensated at a rate of $25 an hour. Later, when Wilson determined he needed to draw a larger monthly salary to support his family, it appears he adjusted Plaintiff's compensation. Plaintiff tracked her hours worked using the company's computerized timekeeping system until Wilson directed Plaintiff, through Lisa, to stop. At some point, it appears Wilson told Plaintiff the company could no longer afford to pay her and that Plaintiff had to stop drawing a paycheck. Wilson also told Plaintiff the company would not be able to pay her until business improved. It further appears Wilson exerted more control over the operation of the company than any of the other officers, in part because it was understood he had the most experience with motorcycles. The foregoing evidence suggests Wilson had substantial control over the circumstances leading up to the alleged FLSA violation and that, had Wilson exerted better control over the company, the alleged FLSA violation might not have occurred. While Defendants suggest it was Plaintiff who was in charge of payroll and that Plaintiff could have written a company check to pay herself if she wanted to, the evidence suggests it was Wilson who dictated payroll priorities and determined when Plaintiff could and could not pay herself. As the majority shareholders, the Wilsons would certainly have had more control over the company's finances than Plaintiff, despite Defendants' suggestions to the contrary. Taken together, these circumstances suggest, insofar as Plaintiff's employment as officer manager was concerned, Defendants had control over the conditions of Plaintiff's employment and determined her rate of payment, and that the economic reality of the situation was Defendants were Plaintiff's employer and

17

1  she their employee.  Given the company was an S corporation, Plaintiff also presumably received

2  her wages in the form of corporate earnings that were "passed on" to her.  This form of payment

3  further supports existence of an employer-employee relationship between Defendants and Plaintiff.

4  　　　One other circumstance suggests the Wilsons exerted significant economic control over their

5  relationship with Plaintiff.  *See Boucher, supra,* 572 F.3d at 1091.  Plaintiff's employment as office

6  manager accompanied her status as a minority shareholder, and her rights as a minority shareholder

7  were subject to significant limitation by the Wilsons.  As the *Hollis* court noted, "it is not difficult

8  for a controlling shareholder [in a closely held corporation] to frustrate [other shareholders']

9  expectations and deny a return on investment through means that would otherwise be legitimate."

10  *Hollis, supra,* 232 F.3d at 467; *accord Lavian, supra,* 884 F.Supp. at 680 ("[T]he dynamics of

11  control [in a closely held corporation] could subjugate a minority shareholder to the majority

12  shareholder's direction, leaving him with little real authority to act on behalf of the corporation").

13  "The minority is vulnerable to a variety of oppressive devices, termed 'freezeouts,' which the

14  majority may employ." *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 588,

15  328 N.E.2d 505 (1975).  For example, "S corporation shareholders are taxed on their share of the

16  S corporation's income regardless of whether the corporation makes any distributions. [Citation.]

17  [¶] . . . [¶] . . . '[M]ajority shareholders in a close corporation [may] deliberately try to squeeze out

18  a minority member by withholding [distributions], the majority hoping to ultimately buy out the

19  minority interest at a price considerably less than its actual value.' [Citation.]" *Arnold v. Scoma,*

20  2006 WL 3582035 (Cal.App. 1 Dist. 2006) (unpublished), at *5.[5]  "[Other] devices include . . .

21  refusing to declare dividends, draining of corporate earnings in the form of exorbitant salaries and

22  bonuses paid to majority shareholders, denying minority shareholders corporate offices and

23  employment, and selling corporate assets to majority shareholders at reduced prices." *Walta v.*

24  *Gallegos Law Firm, P.C.,* 131 N.M. 544, 551, 40 P.3d 449 (2001).  In this case, it appears the

25  

26  　　　[5] Again, the Court may cite unpublished California appellate decisions as persuasive
    authority. *See Employers Ins. of Wausau, supra,* 330 F.3d at 1220 n. 8.

27  

28  　　　　　　　　　　　　　　　　　　　18

Wilsons used their position as majority shareholders to hold a vote ultimately removing Plaintiff from her position as CFO.  That this vote appears to have occurred sometime after Wilson told Plaintiff the company could no longer afford to pay her for working as the officer manager further supports the conclusion a reasonable trier of fact could find Plaintiff was the corporation's employee under the FLSA.  Based on the foregoing, Defendants' motion for summary adjudication of the second and twelfth causes of action for violation of the FLSA and FLSA penalties must be denied.

As a final point, the Court notes the FLSA provides an exemption from the minimum wage provisions of section 206 for "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  "The term 'employee employed in a bona fide administrative capacity' in section 13(a)(1) of the [FLSA] shall mean any employee: [¶] (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities; [¶] (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and [¶] (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  There is evidence to suggest Plaintiff might have been employed in a bona fide administrative capacity.  That said, "exemptions are construed narrowly against the [putative] employer, and the employer has the burden of proving that an employee is exempt."  *Tyler v. Union Oil Co. of California,* 304 F3d. 379, 402 (5th Cir. 2002); *see Lavian v. Haghnazari,* 884 F.Supp. 670, 678 (E.D.N.Y. 1995) ("[T]he regulations require 'the exempt or nonexempt status of any particular employee [to] be determined on the basis of whether his duties, responsibilities and salary meet all the requirements of the appropriate section of the regulations' ").  Defendants have provided no argument or evidence to meet this burden.  Therefore, the Court cannot conclude the section 213 exemption applies.

***2. Defendants' second argument (no termination)*** – Defendants further move for summary adjudication of the tenth cause of action for wrongful termination in violation of public policy. Under

the cause of action for wrongful termination, Plaintiff alleges: "Plaintiff complained to Corporate Defendants and/or Does 1-10 about their failure to pay Plaintiff wages, and made a demand for payment of wages earned, yet Defendants refused to do so. Instead, Defendants terminated Plaintiff's employment for her opposition to the unlawful practice of Defendants of failing to pay wages to employees . . . ." Defendants now contend that even if Plaintiff were Defendants' employee, Plaintiff cannot prove her claim because she was not terminated by Defendants as a matter of law.

In California, claims of wrongful termination in violation of public policy were first recognized in *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) and are known as *Tameny* claims. "*Tameny* claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision." *Kelly v. Methodist Hospital of Southern Cal.,* 22 Cal.4th 1108, 1112, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000). Plaintiff essentially claims she was terminated for her internal reporting of Defendants' allegedly unlawful wage practices. "California's labor statutes reflect a strong public policy in favor of full payment of wages for all hours worked," *Armenta v. Osmose, Inc.,* 135 Cal.App.4th 314, 324, 37 Cal.Rptr.3d 460 (2006), and California courts have consistently recognized *Tameny* claims where, similar to here, an employee alleges he or she was terminated in retaliation for reporting to his or her employer or to a government agency reasonably suspected illegal conduct by the employer or other employees. *See, e.g., Casella v. Southwest Dealer Services, Inc.,* 157 Cal.App.4th 1127, 1141-42, 69 Cal.Rptr.3d 445 (2007); *Haney v. Aramark Uniform Services, Inc.,* 121 Cal.App.4th 623, 643, 17 Cal.Rptr.3d 336 (2004); *Jie v. Liang Tai Knitwear Co.,* 89 Cal.App.4th 654, 661-62, 107 Cal.Rptr.2d 682 (2001); *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App.4th 1137, 1150-51, 37 Cal.Rptr.2d 718 (1995); *Holmes v. General Dynamics Corp.,* 17 Cal.App.4th 1418, 1426, 22 Cal.Rptr.2d 172 (1993); *Blom v. N.G.K. Spark Plugs, Inc.,* 3 Cal.App.4th 382, 388-89, 4 Cal.Rptr.2d 139 (1992); *Collier v. Superior Court,* 228 Cal.App.3d 1117, 1119, 279 Cal.Rptr. 453 (1991).

"When a plaintiff alleges retaliatory employment termination . . . as a claim for wrongful

employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 to determine whether there are triable issues of fact for resolution by a jury." *Loggins v. Kaiser Permanente International,* 151 Cal.App.4th 1102, 1108-1109, 60 Cal.Rptr.3d 45 (2007). "In the first stage, the 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.] If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation " ' "drops out of the picture," ' " ' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual." *Id*. at 1109.

        This order of proof applies, however, only when wrongful termination claims are *tried* before a court or a jury. *See Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 352, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000). On motion for summary judgment, the burdens are reversed: "A defendant seeking summary judgment must bear the initial burden of showing that the action has no merit, and the plaintiff will not be required to respond unless and until the defendant has borne that burden." *Martin v. Lockheed Missiles & Space Co.,* 29 Cal.App.4th 1718, 1730, 35 Cal.Rptr.2d 181 (1994) (internal citations and quotations omitted); *accord Department of Fair Employment and Housing v. Lucent Technologies,* 642 F.3d 728, 745 (9th Cir. 2011). Therefore, the employer has the initial burden of showing (1) the plaintiff cannot establish one or more of the elements of his or her prima facie case or (2) there was a legitimate, non-retaliatory reason for terminating the plaintiff. *See Wills v. Superior Court,* 195 Cal.App.4th 143, 160, 125 Cal.Rptr.3d 1 (2011); *Lucent Technologies, supra,* 645 F.3d at 745 (citing *Avila v. Continental Airlines, Inc.,* 165 Cal.App.4th 1237, 82 Cal.Rptr.3d 440, 449 (2008)). "If the employer presents admissible evidence that one or more of plaintiff's

prima facie elements is lacking, or that the adverse employment action was based on legitimate, [non-retaliatory] factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." *Caldwell v. Paramount Unified School Dist.,* 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448 (1995). "The employee can satisfy its burden by 'produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual.' " *Lucent Technologies, supra,* 642 F.3d at 746 (quoting *Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215, 224, 87 Cal.Rptr.2d 487 (1999)).

To meet their initial burden, Defendants contend Plaintiff cannot establish a prima facie case of wrongful termination in violation of public policy because Plaintiff was never terminated. As support for this contention, Defendants adduce as evidence portions of Plaintiff's deposition. At her deposition, Plaintiff testified that on February 18, 2010, she was removed as the chief financial officer of the corporation pursuant to a meeting in which other shareholders – presumably the majority shareholders, defendant Robert D. Wilson and his wife Lisa – voted to remove her and her husband, Terry Hess, as officers. Plaintiff further testified the shareholders approved the issuance of additional shares of stock and gave her the option to purchase additional shares, but she declined to exercise the option because she had already been voted out of office and did not want "to continue putting money into a business [that was] struggling." Plaintiff further testified that after she was removed as chief financial officer, she did not continue to work at the dealership as an office manager. However, Plaintiff further testified no one informed her she had been removed as the office manager or that she was not allowed to continue working as the office manager. From this, Defendants contend a reasonable trier of fact would have no choice but to conclude Plaintiff stopped working at the dealership simply of her own accord, without any coercion by Defendants. Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court does not agree. At the very least, the evidence in the record supports the theory Plaintiff stopped working for Defendants as a direct result of Defendants' alleged failure to pay wages, and was therefore constructively discharged by Defendants for reasons (i.e., to avoid paying Plaintiff or

addressing her complaints of unlawful wage practices) that contravened the fundamental public policy implicated by the California Labor Code. *See Gould, supra,* 31 Cal.App.4th 1137, 1148, 37 Cal.Rptr.2d 718 (1995) ("If MSI discharged Gould in order to avoid paying him the commissions, the vacation pay, and other amounts he earned, it violated a fundamental public policy of this state").

" 'In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.' " *Steele v. Youthful Offender Parole Bd.,* 162 Cal.App.4th 1241, 1253, 76 Cal.Rptr.3d 632 (2008) (quoting *Turner v. Anheuser-Busch, Inc.,* 7 Cal.4th 1238, 1251, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994)). "To be 'intolerable' or 'aggravated,' the employee's working conditions must be 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.' " *Steele, supra,* at p. 1253 (quoting *Turner, supra,* at p. 1246). "The standard by which a constructive discharge is determined is an objective one – the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " *Turner, supra,* at p. 1248 (quoting *Rochlis v. Walt Disney Co.,* 19 Cal.App.4th 201, 212, 23 Cal.Rptr.2d 793 (1993)).

The evidence shows that at the time she started working as Defendants' office manager, Plaintiff was compensated at a rate of $25 per hour.  At some point, Wilson began drawing a monthly salary of $5,700 for himself and adjusted Plaintiff's compensation to be more in line with his own.  Defendants contend – and Plaintiff does not dispute – the parties agreed Plaintiff would be compensated at a bimonthly rate of $2,769.23.  Eventually, Wilson told Plaintiff the business was struggling and told her to stop taking pay.  In the Court's view, a reduction in compensation as severe as the one experienced by Plaintiff could lead a reasonable trier of fact to conclude Plaintiff's working conditions were so intolerable she had to involuntarily stop working as the office manager.

*Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149 (2d Cir. 1998) is instructive on this issue. The plaintiff in *Kirsch*, a road salesman and sales administrator for a privately-held company that designed and manufactured women's and children's outer garments, left his job after the company reduced his yearly salary from $60,000 to $26,000 and reassigned his largest sales account, on which he earned commission, to the company's national sales director. *Id*. at 156-58. On appeal before the Second Circuit was the issue of whether evidence of the reduction in salary and transfer of account was sufficient for a reasonable trier of fact to find the plaintiff had been constructively discharged. *Id*. at 158. The court concluded it was: "In the present case, Kirsch was earning a salary of $60,000 in May 1991 and was entitled to a 2% override on sales to his customers in excess of $2 million. At the end of May, Fleet Street informed Kirsch that it was cutting his salary to less than 45% of what he had been earning, i.e., from $60,000 to $26,000. Further, the company informed Kirsch that it was taking the Stern's account from him; since Stern's had accounted for 40-45% of Kirsch's sales, this essentially ended Kirsch's prospects for additional earnings through his override. The jury was free to infer that the reduction of compensation, from $60,000 plus override, to $26,000 without override, constituted a condition so difficult that a reasonable person in Kirsch's shoes would have felt compelled to resign." *Id*. at 161. Similarly here, a jury could find the reduction of Plaintiff's compensation, from what was effectively $66,461.52 a year to nothing, constituted a working condition so difficult that a reasonable person in Plaintiff's position would have felt compelled to resign. Given the reduction in salary appears to have been directly imposed by Defendants, a jury could also find Defendants intentionally created or knowingly permitted the condition to occur.

Admittedly, the Ninth Circuit "set[s] the bar high for a claim of constructive discharge because federal [anti-retaliation] policies are better served when the employee and employer [address working conditions] within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff,* 494 F.3d 1174, 1184 (9th Cir. 2007). Nevertheless, the Court believes a reasonable trier of fact could conclude the bar was met here. The evidence shows Plaintiff attempted to resolve the

wage issue with Defendants.  Plaintiff testified she asked Wilson on two occasions to pay her for hours worked and sent an email to him demanding payment of wages after she quit the company in 2010.  Wilson testified he did not respond to Plaintiff's email, and his response to Plaintiff's verbal demands – that the business could not afford to pay her – suggests Defendants were not interested in working out the problem.  In the Court's view, no reasonable person in Plaintiff's position would have continued to remain on the job after being rebuffed in his or her efforts to obtain compensation. *See Hunt v. City of Markham, Ill.,* 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable"); *compare Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir. 1986) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged").

One might argue that continuing to work without pay for two years, as Plaintiff apparently did here, is not the action of a person for whom working conditions are so intolerable or aggravated the person would be compelled to resign.  Ordinarily, the Court might be inclined to agree with this sentiment.  *See Manatt v. Bank of America, NA,* 339 F.3d 792, 804 (9th Cir. 2003) (holding constructive discharge claim untenable where racially offensive work environment alleged by plaintiff ended in March 1998, but plaintiff did not quit working for his employer until April 2000). Problematically for Defendants, the evidence shows the parties may have had an agreement to provide Plaintiff with back pay for unpaid hours worked once the company's finances improved. Plaintiff testifies there was an agreement; Wilson testifies there was not.  Regardless, the possibility of such an agreement suggests it might not have been unreasonable for Plaintiff to work without pay for as long as she did and, the prospect of back pay having never materialized, the lack of pay eventually became so intolerable or aggravated to Plaintiff she was compelled to quit her job.

Defendants further suggest summary adjudication must be granted because Defendants failed to pay Plaintiff not because of any prohibited reason, but because of financial difficulties.  To the

extent Defendants intend to meet their burden on summary judgment by suggesting the fact the business was doing poorly was a legitimate, non-retaliatory reason for failing to pay Plaintiff, the Court finds sufficient evidence in the record from which a reasonable trier of fact could conclude the proffered reason was merely pretext.  At her deposition, Plaintiff testified that at the time Defendants were allegedly unable to pay her, they were able to hire another employee at a salary of approximately $40,000 a year.  Plaintiff further testified Wilson took pay for at least part of this time.

In their reply, Defendants raise two new arguments.  Defendants first contend, "Realizing that the undisputed facts of this case establish that the defendants did not actually fire the plaintiff from her position [citation], the plaintiff now attempts to claim that she was constructively terminated. It should be pointed out that the plaintiff's [c]omplaint does not allege a constructive wrongful termination.  Ordinarily, the materiality of particular facts is determined by the pleadings and [s]ummary [j]udgment cannot be granted on the basis of claims or defenses not pled."  Defendants further allude to a causality argument: "While plaintiff's [o]pposition asserts that she was removed from her position because she was demanding to be paid for her work at the dealership, there are no facts presented which establish that the plaintiff was removed from this position for that reason." The Court has discretion to disregard these arguments, as " '[a]rguments raised for the first time in a reply brief are waived.' "  *Autotel v. Nevada Bell Telephone Co.,* _F.3d_ (9th Cir. 2012), 2012 WL 3799919 at *4 n. 3 (quoting *Turtle Island Restoration Network v. U.S. Dept. of Commerce,* 672 F.3d 1160, 1166 n. 8 (9th Cir. 2012)).  However, the Court will address them for the sake of completeness.

Defendants' contention Plaintiff should not permitted to pursue a cause of action for wrongful termination on a constructive discharge theory simply because she did not allege a "constructive wrongful termination" in the complaint presupposes there are separate and distinct causes of action for wrongful actual discharge and wrongful constructive discharge.  In California, this is not the case.  "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing." *Turner, supra,* 7 Cal.4th at 1251.  "Constructive discharge occurs when the employer's conduct effectively forces an

employee to resign.   Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will.   As a result, a constructive discharge is legally regarded as a firing rather than a resignation." *Id*. at 1244-45. "Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful* discharge. [Citation.] [¶] . . . [¶] [A] constructive discharge may, in particular circumstances, amount to a breach of an employer's express or implied agreement not to terminate except in accordance with specified procedures or without good cause. [Citation.] [¶] [Nevertheless,] [a]part from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision. [Citation.] An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee. [Citations.]" *Id*. at 1252 (emphases original).   Within the cause of action for wrongful termination in violation of public policy, Plaintiff, as noted above, alleged: "Plaintiff complained to Corporate Defendants and/or Does 1-10 about their failure to pay Plaintiff wages, and made a demand for payment of wages earned, yet Defendants refused to do so.   Instead, Defendants terminated Plaintiff's employment for her opposition to the unlawful practice of Defendants of failing to pay wages to employees[.]"   Under *Turner*, these allegations were broad enough to encompass Plaintiff's more specific claim her termination was a constructive one.   Even if they were not, the Court could nonetheless construe Plaintiff's opposition as a request to amend the complaint to advance a claim of constructive discharge and grant the request.   *See Sherman v. Hallbauer,* 455 F.3d 1236, 1242 (5th Cir. 1972).

Defendants further suggest Plaintiff cannot demonstrate the requisite causal connection between any protected activity she might have engaged in (e.g., demanding that she be paid/complaining about Defendants' wage practices) and her constructive discharge.   As noted above, Plaintiff must show a causal link between the protected activity and the adverse employment action.   *See Loggins, supra,* 151 Cal.App.4th at 1109.   Here, a reasonable trier of fact could find the

requisite link between Defendants' alleged public policy violation and Plaintiff's constructive discharge.  While this case presents unusual circumstances in that it appears Defendants had already stopped paying Plaintiff by the time Plaintiff allegedly complained, the fact Defendants did not seriously address Plaintiff's complaints suggests Defendants might have "failed to remedy the situation in order to force [Plaintiff] to resign."  *Turner, supra,* 7 Cal.4th at 1250.  Certainly, the evidence supports a finding Defendants' failure to respond to Plaintiff's verbal demands in the time leading up to her unofficial separation precipitated or was a substantial factor in her leaving the company.  Based on the foregoing, the Court finds genuine issues of material fact as to whether Plaintiff was constructively discharged by Defendants in retaliation for her complaints and/or to avoid paying her wages for the hours that she worked.  Accordingly, Defendants are not entitled to summary adjudication of the cause of action for wrongful termination in violation of public policy.

***3. Defendants' third argument (no violation of Labor Code § 201)*** – Defendants further move for summary adjudication of the first cause of action for violation of California Labor Code § 201. Section 201 provides in pertinent part, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."  Cal. Lab. Code, § 201, subd. (a).  Under the first cause of action, Plaintiff alleges Defendants violated section 201 "[b]y failing to pay Plaintiff 40 weeks of wages due and owing at the time of her employment termination[.]"  Defendants now contend the statute is inapplicable because Plaintiff "was never 'discharged' from her employment" with Defendants.  Given the Court has found genuine issues of material fact as to whether Plaintiff was compelled to leave her job because of Defendants' failure to pay wages, and therefore constructively discharged, summary adjudication of this cause of action must be denied.

***4. Defendants' fourth argument (no violation of Labor Code § 226)*** – Defendants further move for

28

summary adjudication of the third cause of action for violation of California Labor Code § 226.[6]
Under this cause of action, Plaintiff alleges Defendants "willfully failed to issue any wage statement
to Plaintiff during 40 weeks of her employment between January 2008 and February of 2009" and
"willfully failed to provide an itemized wage statement despite Plaintiff's written demand in May
of 2010." Pointing to Plaintiff's deposition testimony wherein she stated that during the time frame
at issue (1) she "didn't get a check, so [she] didn't have a wage statement" but (2) had access to
Paychex, the payroll system presumably used by the company, to obtain a wage statement even if
she did not have any wages, Defendants now contend, "[S]ince the plaintiff was not paid any wages
between January 2008 and February 2009, the employer was not required to provide her with an
itemized wage statement, so that the defendants would not be liable under this statute." Defendants
further contend, "If the plaintiff desired to receive a wage statement between January 2008 and
February 2009, she could have obtained one from . . . Paychex." The problem with these arguments
is they presuppose Defendants' failure to pay wages to Plaintiff was not wrongful. Given there are
genuine issues of material fact as to whether Defendants violated the FLSA and Labor Code § 201
by failing to pay Plaintiff wages, there are necessarily issues of fact as to whether such failure was
wrongful. If a jury were to conclude such failure was wrongful, it could find the failure to provide
Plaintiff with wage statements reflecting those wages was likewise wrongful. Accordingly,

---

[6] Section 226 provides in pertinent part, "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and the last four digits for his or her social security number, (8) the name and address of the legal entity that is the employer and . . . (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Cal. Lab. Code, § 226, subd. (a).

Defendants are not entitled to summary adjudication of the claim for violation of Labor Code § 226.

**5. *Defendants' fifth argument (no violation of Labor Code § 1174)*** – Defendants further move for summary adjudication of the fourth cause of action for violation of California Labor Code § 1174. Section 1174 provides in pertinent part, "Every person employing labor in this state shall: [¶] . . . [¶] (d) Keep, at a central location in the state or at the plants or establishments at which employees are employed, payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or establishments." Cal. Lab. Code, § 1174.  Under this cause of action, Plaintiff alleges: "Defendants have failed to maintain payroll records showing the hours worked daily by Plaintiff and the wages, as yet unpaid, due and owing to Plaintiff."  Defendants now contend, "[T]he plaintiff acknowledged that the business kept records which showed the hours she worked until she stopped clocking in and out. [Citation.]"  Defendants further contend, "Paychex . . . could have provided her with any wage records. [Citation.] These facts demonstrate that the defendants did, in fact, comply with Labor Code section 1174 and so would not be liable under this section."

As support for these contentions, Defendants point to Plaintiff's deposition testimony, wherein Plaintiff testified that, as far as she knew, the company kept records through the "Lightspeed" system that showed the hours an employee worked during the period of time an employee worked at the company.  Plaintiff further testified there was a period of time when she stopped "clocking in and out," as was presumably the method used by the company's employees for recording their work hours.  From this, Defendants appear to suggest the absence of payroll records for any unrecorded hours was necessarily of Plaintiff's own making.  The Court does not agree. Consistent with the analysis of Plaintiff's third cause of action for violation of Labor Code § 226 above, the possibility a jury could find it was wrongful for Defendants not to provide appropriate compensation to Plaintiff for hours worked means a jury could find it was likewise wrongful for Defendants to fail to maintain corresponding payroll records evidencing the hours Plaintiff worked

and the wages she was allegedly owed.  Moreover, Plaintiff testified she stopped clocking in and out because Wilson's wife, Lisa, told her Wilson no longer wanted Plaintiff to do so.  Based on this evidence, a reasonable trier of fact could further find Plaintiff worked off the clock at the request of Defendants, and it was Defendants – not Plaintiff – who caused the absence of any payroll records.  Accordingly, summary adjudication of the claim for violation of Labor Code § 1174 must be denied.

***6. Defendants' sixth argument (no violation of Labor Code § 227.3)*** – Defendants further move for summary adjudication of the fifth cause of action for violation of California Labor Code § 227.3.  Section 227.3 provides in pertinent part, "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination." Cal. Lab. Code, § 227.3.  Under this cause of action, Plaintiff alleges: "Defendant employers had a policy of providing for paid vacations. [¶] Plaintiff had accrued vacation time that was vested at the time of her employment discharge. [¶] Defendants failed, and continue to fail, to pay Plaintiff her vacation time that was vested at the time of her discharge."  Defendants now contend summary adjudication must be granted because Plaintiff was never terminated as a matter of law.  Citing Plaintiff's testimony the amount of time she could take off from the business was "left up to" Wilson and herself and that if she or Wilson took days off, they would be paid the days because they were on salary, Defendants further contend, "[D]efendants did not provide paid vacation time to shareholders, who simply were allowed to take time off whenever they wished."  The Court has already addressed Defendants' contention Plaintiff was never terminated and found it to be without merit.  Defendants' contention Plaintiff was not entitled to vacation time because she was a shareholder is similarly without merit: as should be evident throughout this order, there are sufficient issues of material fact

to suggest Plaintiff was not merely a shareholder but also an employee of Defendants, and was thus entitled to vested vacation pay. Accordingly, summary adjudication of this claim must be denied.

***7. Defendants' seventh argument (no violation of Labor Code § 1197)*** – Defendants further move for summary adjudication of the sixth cause of action for violation of California Labor Code § 1197. Section 1197 provides, "The minimum wage for employees fixed by the [Labor] commission is the minimum wage to be paid to employees, and the payment of a less wage than the minimum fixed is unlawful." Cal. Lab. Code, § 1197. Under this cause of action, Plaintiff alleges: "Defendants, by intentionally failing to pay Plaintiff any wages whatsoever for 40 pay periods, failed to pay Plaintiff the minimum wage fixed by the commission." Defendants now contend summary adjudication must be granted because the evidence shows Plaintiff was not an employee protected under the Labor Code. Having reviewed the pleadings of record and all competent admissible evidence submitted, the Court finds Defendants have failed to meet their initial burden to show Plaintiff was not a Labor Code employee. As support for their contention, Defendants cite and apply the common law control test set forth in *S.G. Borrello & Sons, Inc. v. Department of Industrial Relations,* 48 Cal.3d 341, 350-51, 256 Cal.Rptr. 543, 769 P.2d 399 (1989) (*Borrello*) for determining whether a person rendering service to another is an employee or an independent contractor. Problematically for Defendants, the *Borrello* court applied the test within the confines of the Labor Code's *workers' compensation* provisions. *See id.* Defendants have provided no authority – and the Court's research reveals no authority – to suggest the test also applies in the context of the Labor Code's *minimum wage* provisions. In *Martinez v. Combs,* 49 Cal.4th 35, 109 Cal.Rptr.3d 514, 231 P.3d 259 (2010), the California Supreme Court held that in actions to recover unpaid minimum wages, as here, the employment relationship is defined by the applicable Industrial Welfare Commission (IWC) wage order, not the common law test. *Id.* at 61-66. In conjunction with her minimum wage claims, Plaintiff alleges Defendants were subject to IWC order no. 4-2001. Defendants have provided no argument or evidence to explain how the parties' relationship could conceivably fail to come within

the ambit of that order.  Accordingly, summary adjudication of this cause of action must be denied.

**8. Defendants' eighth argument (no violation of Labor Code §§ 226.7 and 512 and IWC 4)** –
Defendant further moves for summary adjudication of the seventh cause of action for violation of
California Labor Code §§ 226.7 and 512 and IWC Wage Order 4-2001.  Section 226.7 provides, "(a)
No employer shall require any employee to work during any meal or rest period mandated by an
applicable order of the Industrial Welfare Commission. [¶] (b) If an employer fails to provide an
employee a meal period or rest period in accordance with an applicable order of the Industrial
Welfare Commission, the employer shall pay the employee one additional hour of pay at the
employee's regular rate of compensation for each work day that the meal or rest period is not
provided." Cal. Lab. Code, § 226.7.  Section 512 provides in pertinent part, "An employer may not
employ an employee for a work period of more than five hours per day without providing the
employee with a meal period of not less than 30 minutes[.]" Cal. Lab. Code, § 512, subd. (a).  "IWC
Wage Order No. 4-2001 regulates the wages, hours, and working conditions in professional,
technical, clerical, mechanical and similar occupations.  *See* Cal. Code Regs., tit. 8, § 11040.  As
relevant here, order no. 4-2001 essentially implements sections 226.7 and 512.  *See id.,* § 11040(11),
(12).  Under this cause of action, Plaintiff alleges: "Corporate Defendants and/or Does 1-10 required
Plaintiff to work through her meal periods."  Plaintiff further alleges: "Corporate Defendants and/or
Does 1-10 did not authorize Plaintiff to take rest periods."  Defendants now contend summary
adjudication must be granted because Plaintiff was not an employee under the Labor Code.  As
support for this contention, Defendants makes the same arguments made in reference to Plaintiff's
sixth cause of action.  Consistent with its analysis above, the Court finds this effort insufficient to
meet Defendants' initial burden.  Accordingly, summary adjudication of this claim shall be denied.

**9. Defendants' ninth argument (no violation of Labor Code § 510 or IWC 4)** – Defendants further
move for summary adjudication of the eighth cause of action for violation of California Labor Code

§ 510 and IWC Wage Order 4-2001.  Section 510 provides in pertinent part, "Eight hours of labor constitutes a day's work.  Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee."  Cal. Lab. Code, § 510, subd. (a).  As relevant here, IWC Wage Order 4-2001 essentially implements section 510.  *See* Cal. Code Regs., tit. 8, § 11040(3)(a)(1).  Under this cause of action, Plaintiff alleges: "Plaintiff was entitled a rate of pay equal to one and one half-times [sic] her regular rate of pay for time Plaintiff worked in excess of eight hours in a single day or forty-hours [sic] in a single week.  Plaintiff frequently worked overtime on both a daily and weekly basis.  Defendants never compensated Plaintiff for any of the overtime hours that she worked."  Defendants now contend summary adjudication must be granted because Plaintiff was not an employee.  As support for this contention, Defendants makes the same arguments made in reference to Plaintiff's sixth cause of action.  Consistent with its analysis above, the Court finds this effort insufficient to meet Defendants' initial burden.  Accordingly, summary adjudication of this claim shall be denied.

**10. Defendants' tenth argument (no violation of Business and Professions Code § 17200)** – Defendants further move for summary adjudication of the ninth cause of action for violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq.  "In order to state a claim for a violation of the [UCL], a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair."  *Levine v. Blue Shield of California,* 189 Cal.App.4th 1117, 1136, 117 Cal.Rptr.3d 262 (2010).  The UCL "protect[s] both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002).  " 'Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent.  "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' "  *Cel-Tech Communications, Inc. v. Los*

*Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Plaintiff asserts this claim under the UCL's unlawful prong.  An unlawful business practice is one that " 'is forbidden by any law,' " *Olszewski v. Scripps Health,* 30 Cal.4th 798, 827, 135 Cal.Rptr.2d 1, 69 P.3d 927 (2003), and "[v]irtually any law – federal, state or local – can serve as a predicate for a section 17200 action," *State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal.App.4th 1093, 1102-03, 53 Cal.Rptr.2d 229 (1996) (abrogated on other grounds by *Cel-Tech Communications, Inc., supra,* 20 Cal.4th at 180).  Plaintiff alleges: "Beginning in January of 2008 and continuing until the time of Plaintiff's discharge in February of 2010, Defendants committed unlawful acts as defined by . . . § 17200.  Defendants' unlawful . . . business practices include, but are not necessarily limited to, violation of the California Labor Code."  Defendants now contend summary adjudication must be granted because the evidence shows Defendants are not liable under any of the Labor Code statutes.  Given Defendants have failed to meet their initial burden on summary judgment as to any of Plaintiff's substantive Labor Code causes of action, this most current contention is not ground for summary adjudication of the UCL cause of action.

**11. Defendants' eleventh and final argument (no penalties under Labor Code § 203)** – Lastly, Defendants move for summary adjudication of the eleventh cause of action for penalties under California Labor Code § 203.  Section 203 provides in pertinent part, "If any employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action there os commences; but the wages shall not continue for more than 30 days."  Cal. Lab. Code, § 203, subd. (a).  Under this cause of action, Plaintiff alleges: "Defendants discharged Plaintiff on or about January 29, 2012 without good cause.  Thereafter, Defendants willfully failed to pay[ ] Plaintiff wages owed under Labor Code Section 201 at the time of termination.  To date, Defendants have still not paid Plaintiff wages due and owing."  Defendants now contend summary adjudication must be granted because Plaintiff was not an employee.  As support for this contention, Defendants

35

make the same arguments made in reference to Plaintiff's sixth cause of action.  Consistent with its analysis above, the Court finds this effort insufficient to meet Defendants' initial burden. Accordingly, summary adjudication of this cause of action shall be denied.

## V. DISPOSITION

Based on the foregoing, Defendants' motion for summary judgment or summary adjudication in the alternative is DENIED in its entirety.

IT IS SO ORDERED.

Dated:    September 14, 2012    

_____
CHIEF UNITED STATES DISTRICT JUDGE

36